# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>THE DIGITAL DEVICE ASSIGNED CALL NUMBER 562-335-2280 AND SUBSCRIBED TO MARYLYNN PENEUETA | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No.  5:20-MJ-00123 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-6*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B-2*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Bank Fraud |
| 18 U.S.C. § 1956(h) | Conspiracy to Commit Money Laundering |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days:_____*) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Bryce Taylor, USSS Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

City and state:  Los Angeles, CA_____

_____
*Judge's signature*

Hon. Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Scott D. Dubois (x0882)

## ATTACHMENT A-6

<u>DEVICE SUBJECT TO SEARCH AND SEIZURE</u>

The digital device assigned call number 562-335-2280 and subscribed to Marylynn Peneueta.  The Service Provider is Verizon Wireless.

**ATTACHMENT B-2**

## I.  ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1349 (Bank Fraud Conspiracy), 1956(h) (Money Laundering Conspiracy) and 1028A (Aggravated Identity Theft) (collectively, the "Subject Offenses") by Jacob Sagiao ("SAGIAO"), Marylynn Peneueta ("PENEUETA"), Britt Jackson ("JACKSON"), Joshua Fitten ("FITTEN"), Dontae Cottrell ("COTTRELL"), Arinze Obika ("OBIKA"), Ndukwe Anyaogu ("ANYAOGU"), Herman Bass ("BASS"), David Uro ("URO"), and Victor Ahaiwe ("AHAIWE") (collectively, the "Defendants") from 2019 to the present, namely:

a.    Evidence concerning commission of the Subject Offenses, including without limitation, evidence of any financial transactions taken to conceal the source of the proceeds of any unlawful activity related to the Subject Offenses;

b.    Evidence concerning ownership, use, or control of any bank account related to the Subject Offenses, including without limitation any data reflecting online banking;

c.    Evidence concerning ownership, control, or operation by the Defendants of any corporation, partnership, proprietorship, company, or other business or legal entity related to the Subject Offenses;

d.    Evidence showing ownership or control by the Defendants of any email account, messaging account, or other

x

online account used to communicate with co-conspirators or victims or to commit the Subject Offenses;

e.   Evidence concerning the identity or location of, the contact information for, and communications with, any potential co-conspirators related to the Subject Offenses;

f.   Evidence concerning the identity or location of, the contact information for, and communications with, any potential victims of the Subject Offenses;

g.   Evidence concerning identity theft related to the Subject Offenses;

h.   All financial documents, including all federal tax returns and supporting documents, for any of the Defendants and or any entity or business owned or associated with any of the Defendants related to the Subject Offenses;

i.   Evidence of the Defendants' location, such as GPS location, including without limitation any evidence of domestic and international travel;

j.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii. evidence of the attachment of other devices;

      iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      v.   evidence of the times the device was used;

      vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

      vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      viii.    records of or information about Internet Protocol addresses used by the device;

      ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

   2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall

complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

      b.   The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

      i.   The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized.  The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to
determine, pursuant to the search protocols, whether the data
falls within the list of items to be seized.

      ii.  The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

      iii. The search team may use forensic examination
and searching tools, such as "EnCase" and "FTK" (Forensic Tool
Kit), which tools may use hashing and other sophisticated
techniques.

      c.   If the search team, while searching a digital
device, encounters immediately apparent contraband or other
evidence of a crime outside the scope of the items to be seized,
the team shall immediately discontinue its search of that device

xiv

pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

   d. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

   e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

   f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

   g. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress the device user's thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the device user's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

xvii

apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, BRYCE TAYLOR, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for warrants to search the following premises (collectively, the "SUBJECT PREMISES") as described more fully below and in Attachments A-1 through A-4:

        a.    The premises located at 14853 Folger Street, Hacienda Heights, California ("FITTEN Address");

        b.    The premises located at 13114 Putnam Street Whittier, California ("COTTRELL Address");

        c.    The premises located at 5444 Crenshaw Boulevard, Suite 209, Los Angeles, California ("AHAIWE Address-1"); and

        d.    The premises located at 9446 Sunglow Court, Rancho Cucamonga, California ("AHAIWE Address-2").

2.    This affidavit is further made in support of an application to seize and search the following electronic devices (collectively, the "SUBJECT DEVICES") as described more fully below and in Attachments A-5 through A-10:

        a.    The cell phone assigned call number 562-200-5781 ("SAGIAO Device");

        b.    The cell phone assigned call number 562-335-2280 ("PENEUETA Device");

        c.    The cell phone assigned call number 714-568-8703 ("FITTEN Device");

        d.    The cell phone assigned call number 562-536-2952 ("COTTRELL Device");

      e.    The cell phone assigned call number 323-377-6734 ("AHAIWE Device"); and

      f.    The cell phone assigned call number 213-909-4975 ("BASS Device").

    3.    The requested search warrants seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1349 (Bank Fraud Conspiracy), 1956(h) (Money Laundering Conspiracy) and 1028A (Aggravated Identity Theft) (collectively, the "Subject Offenses"), as described more fully in Attachments B-1 and B-2. Attachment B-1 identifies the items to be searched and seized from the SUBJECT PREMISES, as identified in Attachments A-1 through A-4.  Attachment B-2 identifies the items to be searched and seized from the SUBJECT DEVICES, as identified in Attachments A-5 through A-10.

    4.    Attachments A-1 through A-10 as well as Attachments B-1 and B-2 are incorporated herein by reference.

    5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

6.   I am a Special Agent with the Department of Homeland Security, United States Secret Service ("USSS"), and have been so employed since July 2007.  Currently, I am assigned to the Riverside Resident Office, where I am responsible for investigating federal criminal violations relating to financial and computer crime.  I am a graduate of the Criminal Investigators Training Program conducted at the Federal Law Enforcement Training Center, as well as the USSS Special Agent Training Course in Beltsville, Maryland.  I have received training related to the investigation and prosecution of financial and high tech crimes.  I hold both a Bachelor and a Master of Science degree in Accounting from Brigham Young University.  I have assisted in numerous financial crimes investigations, including executing search warrants relating to such investigations.

## III. SUMMARY OF PROBABLE CAUSE

7.   On or about February 11, 2020, the Honorable Robert W. Lehrburger, United States Magistrate Judge, Southern District of New York, issued a complaint (the "Complaint") "), incorporated by reference herein as Exhibit 1, and arrest warrants in case number 20-MAG-1546 for Jacob Sagiao ("SAGIAO"), Marylynn Peneueta ("PENEUETA"), Britt Jackson ("JACKSON"), Joshua Fitten ("FITTEN"), Dontae Cottrell ("COTTRELL"), Arinze Obika ("OBIKA"), Ndukwe Anyaogu ("ANYAOGU"), Herman Bass ("BASS"), David Uro ("URO"), and Victor Ahaiwe ("AHAIWE") (collectively,

the "Defendants") for, among other crimes,[1] the Subject Offenses.
The Defendants received, transferred, and sent the proceeds of
two business email compromise schemes (the "BEC Schemes"), in
which the victims were induced to send approximately
$4.5 million to bank accounts controlled by SAGIAO and OBIKA.
All terms contained in quotations in this application (e.g.,
"Bank Account-[Number]," "Company-[Number]," the "Decedent")
have the same meanings as those terms in the Complaint.

## IV. STATEMENT OF PROBABLE CAUSE

### A.    The Subject Offenses

8.    Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following
regarding the Subject Offenses, as set forth more fully in the
Complaint:

9.    The Defendants are charged with operating two BEC
schemes.  In the first BEC Scheme ("BEC-1"), a technology
company ("Victim-1") was induced to send approximately
$4 million to a bank account, which listed, as a "d/b/a" of the
accountholder, the name of an actual business counterparty of
Victim-1 ("Counterparty-1"), but which was actually controlled
by SAGIAO.  After SAGIAO received the proceeds of BEC-1, SAGIAO
transferred those proceeds, either directly or through
intermediaries, to bank accounts controlled by PENEUETA,
JACKSON, FITTEN, and COTTRELL, each of which listed, as a

---

[1]    The Complaint also charges JACKSON and ANYAOGU with
committing wire fraud, in violation of Title 18, United States
Code, Section 1343.

"d/b/a" of the accountholder, a name that closely resembled the name of a real company that the accountholder was not affiliated with.

10.   In the second BEC Scheme ("BEC-2"), a health services organization ("Victim-2") was induced to send approximately $500,000 to a bank account, which listed, as a "d/b/a" of the accountholder, a name that closely resembled the name of a food company ("Counterparty-2"), but which was actually controlled by OBIKA.  After OBIKA received the proceeds of BEC-2, OBIKA transferred those proceeds, either directly or through intermediaries, to bank accounts controlled by SAGIAO, FITTEN, URO, ANYAOGU, and BASS, each of which listed, as a "d/b/a" of the accountholder, a name that closely resembled the name of a real company that the accountholder was not affiliated with. Proceeds of BEC-2 were also sent to AHAIWE, who deposited the funds in a bank account in the name of a deceased person (the "Decedent") that AHAIWE controlled.

11.   SAGIAO received, transferred, and sent proceeds of the BEC Schemes using certain bank accounts, identified in the Complaint as "Phony Counterparty Account-1," "Bank Account-5," and "Bank Account-7," each of which listed, as a "d/b/a" of SAGIAO, a name that closely resembled the name of a real company that SAGIAO was not affiliated with, respectively, "Counterparty-1," "Company-5," and "Company-7."  The specific transactions that SAGIAO engaged in to launder the proceeds of the BEC Schemes are set forth in detail in the Complaint. (Compl. ¶¶ 13(a)-(c), (i), 16(e).)

12.   PENEUETA received, transferred, and sent proceeds of
BEC-1 using a bank account, identified in the Complaint as "Bank
Account-2," which listed, as a "d/b/a" of PENEUETA, a name that
closely resembled the name of a real company that PENEUETA was
not affiliated with, identified in the Complaint as "Company-2."
The specific transactions that PENEUETA engaged in to launder
the proceeds of BEC-1 are set forth in detail in the Complaint.
(Compl. ¶¶ 13(e)-(f).)

13.   FITTEN received proceeds of the BEC Schemes using
certain bank accounts, identified in the Complaint as "Bank
Account-4" and "Bank Account-8," each of which listed, as a
"d/b/a" of FITTEN, a name that closely resembled the name of a
real company that FITTEN was not affiliated with, respectively,
"Company-4" and "Company-8," as identified in the Complaint.
The specific transactions that FITTEN engaged in to launder the
proceeds of the BEC Schemes are set forth in detail in the
Complaint.  (Compl. ¶¶ 13(h), 16(f).)

14.   COTTRELL received proceeds of BEC-1 using a bank
account, identified in the Complaint as "Bank Account-3," which
listed, as a "d/b/a" of COTTRELL, a name that closely resembled
the name of a real company that COTTRELL was not affiliated
with, identified in the Complaint as "Company-3."  The specific
transactions that COTTRELL engaged in to launder the proceeds of
BEC-1 are set forth in detail in the Complaint.  (Compl. ¶
13(g).)

15.   AHAIWE received proceeds of BEC-2 using bank accounts,
identified in the Complaint as "Bank Account-11" and "Bank

Account-12," which were in the name of a deceased person, the

"Decedent."  Bank surveillance shows that, on or about March 6,

2019, AHAIWE accessed "Bank Account-12" from an ATM using a

debit card for "Bank Account-12," which was in the name of the

"Decedent."  (Compl. ¶ 16(i).)

16.  BASS received proceeds of BEC-2 using a bank account,

identified in the Complaint as "Bank Account-10," which listed,

as a "d/b/a" of BASS, a name that closely resembled the name of

a real company that BASS was not affiliated with, identified in

the Complaint as "Company-10."  The specific transactions that

BASS engaged in to launder the proceeds of BEC-2 are set forth

in detail in the Complaint.  (Compl. ¶ 16(h).)

**B.     The SUBJECT PREMISES**

17.  On or about February 11, 2020, the Honorable Robert W.

Lehrburger, United States Magistrate Judge, Southern District of

New York, in case number 20-MAG-1548, issued warrants and orders

(the "GPS Orders") for prospective location and pen register

information for cell phones relating to this investigation,

including the SAGIAO Device, the PENEUETA Device, the FITTEN

Device, the COTTRELL Device, the AHAIWE Device, and the BASS

Device.  Probable cause that each device is currently being used

by each Defendant is set forth in greater detail below.

**The FITTEN Address**

18.  The FITTEN Address is the address that FITTEN listed,

on account records for "Bank Account-4," as the corporate

address of "Company-4."  FITTEN is not affiliated with the real

"Company-4" and "Bank Account-4" received proceeds from BEC-1.

(Compl. ¶ 13(h).)  Accordingly, there is probable cause to search the FITTEN Address for evidence, fruits, and instrumentalities of the Subject Offenses.  Evidence of the Subject Offenses would include the absence of any documents or other materials suggesting that "Company-4," which is a Taiwanese company in the business of manufacturing hand tools and industrial hardware, does business at the FITTEN Address.

19.  Since February 13, 2020, and as recently as February 25, 2020, GPS and cell-site information received in response to the GPS Orders has shown the FITTEN Device to be in the vicinity of the FITTEN Address during the night and early morning hours, when FITTEN would be expected to be home.

20.  On or about December 16, 2019, law enforcement officers saw FITTEN at the FITTEN Address.  Since December 16, 2019, and as recently as February 24, 2020, a vehicle registered to FITTEN has been parked outside the FITTEN Address.

### The COTTRELL Address

21.  The COTTRELL Address is the address that COTTRELL listed, on account records for "Bank Account-3," as the corporate address of "Company-3."  COTTRELL is not affiliated with the real "Company-3" and "Bank Account-3" received proceeds of BEC-1.  (Compl. ¶ 13(g).)  Accordingly, there is probable cause to search the COTTRELL Address for evidence, fruits, and instrumentalities of the Subject Offenses.  Evidence of the Subject Offenses would include the absence of any documents or other materials suggesting that "Company-3," which is a major

California company in the business of manufacturing power tools, does business at the COTTRELL Address.

22.   Since February 14, 2020, and as recently as February 25, 2020, information received in response to the GPS Orders has shown the COTTRELL Device to be in the vicinity of the COTTRELL Address during the night and early morning hours, when COTTRELL would be expected to be home.

23.   According to records maintained by the California Department of Motor Vehicles ("DMV"), the COTTRELL Address is the home address listed on COTTRELL's California driver's license.

**AHAIWE Address-1**

24.   AHAIWE Address-1 is the address listed as the mailing address of the "Decedent," a deceased person who was the purported accountholder of "Bank Account-12," which was opened on or about February 20, 2019.  As set forth in the Complaint, proceeds of BEC-2 were sent to "Bank Account-12," and bank surveillance shows that AHAIWE accessed "Bank Account-12" using a debit card on or about March 6, 2019.  (Compl. ¶ 16(i).) Accordingly, there is probable cause to search AHAIWE Address-1 for evidence, fruits, and instrumentalities of the Subject Offenses.

**AHAIWE Address-2**

25.   Since February 14, 2020, and as recently as February 25, 2020, information received in response to the GPS Orders has shown the AHAIWE Device to be in the vicinity of

AHAIWE Address-2 during the night and early morning hours, when AHAIWE would be expected to be home.

26.  According to records maintained by the California DMV, AHAIWE Address-2 is the home address listed on AHAIWE's California driver's license.

27.  Based on my training and experience, individuals who engage in identity theft often keep, in their homes, means of identification or other documents in the name of the person whose identity was stolen.  For the reasons set forth in the Complaint, there is probable cause to believe that AHAIWE stole the identity of the "Decedent" because AHAIWE used a debit card to access "Bank Account-12," a bank account in the name of the "Decedent" that received proceeds of BEC-2.  (Compl. 16(i).) Accordingly, there is probable cause to believe that AHAIWE keeps evidence, fruits, or instrumentalities of the Subject Offenses in his home.

**C.   The SUBJECT DEVICES**

28.  Like individuals engaged in any other kind of activity, individuals who engage in the Subject Offenses store records relating to their illegal activity and to persons involved with them in that activity on electronic devices such as the SUBJECT DEVICES.  Such records include, but are not limited to, logs of online "chats" with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts; stolen financial and personal identification data, including bank

account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and/or records of illegal transactions using stolen financial and personal identification data. Individuals engaged in criminal activity often store such records in order to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, dividing those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

29. Based on my training and experience, I know that individuals who engage in crimes such as the Subject Offenses, like individuals engaged in any other kind of activity, sometimes obtain new electronic devices and import electronic data from the old devices into the new devices. Each of the SUBJECT DEVICES is the devices currently believed to be in use by one of the Defendants. Although certain SUBJECT DEVICES may not be the same devices used by the Defendants at the time of the Subject Offenses, there is probable to believe that the SUBJECT DEVICES contain electronic data imported from older devices.

### The SAGIAO Device

30. Subscriber records list SAGIAO as the subscriber of the SAGIAO Device as recently as December 16, 2019. Call detail records show that there were nine calls and 50 text messages exchanged between the SAGIAO Device and the PENEUETA Device in

the period between on or about May 29, 2019, and on or about December 6, 2019.

31.  Since February 13, 2020, and as recently as February 25, 2020, information received in response to the GPS Orders has shown the SAGIAO Device to be in the vicinity of an address where SAGIAO is believed to be residing during the night and early morning hours, when SAGIAO would be expected to be home.

### The PENEUETA Device

32.  Subscriber records list PENEUETA as the subscriber of the PENEUETA Device as recently as February 6, 2020.  And, on or about May 23, 2019, PENEUETA listed the PENEUETA Device as her phone number on an application to open a bank account.  On or about February 6, 2020, a law enforcement officer called the PENEUETA Device and heard a voicemail message giving PENEUETA's name.

33.  Since February 13, 2020, and as recently as February 25, 2020, information received in response to the GPS Orders has shown the PENEUETA Device to be in the vicinity of an address where PENEUETA is believed to be residing during the night and early morning hours, when PENEUETA would be expected to be home.

### The FITTEN Device

34.  Subscriber records list FITTEN as the subscriber of the FITTEN Device as recently as December 16, 2019.

35.  Since February 13, 2020, and as recently as February 25, 2020, information received in response to the GPS

Orders has shown the FITTEN Device to be in the vicinity of the FITTEN Address during the night and early morning hours, when FITTEN would be expected to be home.

### The COTTRELL Device

36.  Subscriber records list COTTRELL as the subscriber of the COTTRELL Device as recently as December 16, 2019.

37.  Since February 14, 2020, and as recently as February 25, 2020, information received in response to the GPS Orders has shown the COTTRELL Device to be in the vicinity of the COTTRELL Address during the night and early morning hours, when COTTRELL would be expected to be home.

38.  The COTTRELL Device is the phone number that COTTRELL listed, in "Bank Account-3," as his phone number.  As set forth in more detail in the Complaint, "Bank Account-3" was opened by COTTRELL in the name of "Company-3."  COTTRELL has no known connection to the real "Company-3" and "Bank Account-3" received proceeds of BEC-1. (Compl. ¶ 13(g).)

### The AHAIWE Device

39.  Subscriber records list "David Jacob" as the subscriber of the AHAIWE Device.  Subscriber records further list AHAIWE Address-2 as the home address for the subscriber. As discussed above, AHAIWE Address-2 is the personal home address of AHAIWE.

40.  The AHAIWE Device is the phone number that AHAIWE listed as the phone number of the "Decedent" for "Bank Account-12," which was controlled by AHAIWE and which received proceeds of BEC-2.  (Compl. ¶ 16(i).)

41.  Based on travel records, I have learned that, on or about February 24, 2020, AHAIWE boarded an international flight departing from Los Angeles and that AHAIWE has booked a return flight landing in Los Angeles on March 8, 2020.  As recently as February 26, 2020, at approximately 6:34 P.M., information received in response to the GPS Orders showed that the AHAIWE Device was located in Rancho Cucamonga, California, in the area of AHAIWE Address-2.

### The BASS Device

42.  Subscriber records list "Sonny Shabazz" as the subscriber of the BASS Device.  Subscriber records further list a certain P.O. Box (the "BASS P.O. Box") as the address of the subscriber.  Based on records from the California DMV, I know that BASS listed the BASS P.O. Box as his address on BASS's California driver's license.  Based on records from the United States Postal Office, I know that BASS is the registered holder of the BASS P.O. Box.

43.  The BASS Device is the phone number that BASS listed, in "Bank Account-10," as his phone number.  As set forth in more detail in the Complaint, "Bank Account-10" was opened by BASS in the name of "Company-10."  BASS has no known connection to the real "Company-10" and "Bank Account-10" received proceeds of BEC-2.  (Compl. ¶ 13(h).)

## V.   TRAINING AND EXPERIENCE REGARDING MONEY LAUNDERING AND BANK FRAUD

44.   Based on my training and experience and information obtained from other law enforcement officers who investigate international money laundering schemes, I know the following:

a.   In international money laundering schemes, a significant degree of coordination is required between the individuals who initially engage in and receive the proceeds of the unlawful activity and the individuals who engage in financial transactions designed to conceal the source of those proceeds.

b.   In many such schemes, including the one at issue in this case, the proceeds of unlawful activity may be laundered through numerous transactions involving multiple bank accounts controlled by multiple different individuals.  Furthermore, after the proceeds of unlawful activity have been laundered, those proceeds (or some significant portion thereof) need to be sent back to the individuals who committed the unlawful activity.

c.   Accordingly, in money laundering schemes, it is very likely that there are extensive communications between the individuals involved in the schemes.  For the reasons set forth above, there is probable cause to believe that such communications--among other evidence--can be found on electronic devices, such as the SUBJECT DEVICES.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

45.    Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.    Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,

---

[2] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

   46.   Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.   Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.   Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.   As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

47.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.   To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.   To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.   To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the device user's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the device user's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

48.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

49.   For all of the reasons described above, there is probable cause to believe that the Defendants have committed the Subject Offenses.  There is also probable cause that the items to be seized, as described in Attachment B-1, will be found in a search of the SUBJECT PREMISES, as described in Attachments A-1

through A-4.   There is also probable cause to believe that the
items to be seized, as described in Attachment B-2, will be
found in a search of the SUBJECT DEVICES, as described in
Attachments A-5 through A-10.


_____
BRYCE TAYLOR, Special Agent
United States Secret Service

Subscribed to and sworn before me
this _____ day of February, 2020.


_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE

EXHIBIT 1

Approved:   _____
            JUN XIANG / KEVIN MEAD
            Assistant United States Attorneys

Before:     THE HONORABLE ROBERT W. LEHRBURGER
            United States Magistrate Judge
            Southern District of New York

- - - - - - - - - - - - - - - - - - X
                                    :
UNITED STATES OF AMERICA            :    SEALED COMPLAINT
                                    :
    - v. -                          :    Violations of
                                    :    18 U.S.C. §§ 1028A,
JACOB SAGIAO,                       :    1343, 1349, 1956(h), and
MARYLYNN PENEUETA,                  :    2
BRITT JACKSON,                      :
JOSHUA FITTEN,                      :    COUNTY OF OFFENSE:
DONTAE COTTRELL,                    :    NEW YORK
ARINZE OBIKA,                       :
NDUKWE ANYAOGU,                     :    20 MAG 1546
HERMAN BASS,                        :
DAVID URO, and                      :
VICTOR AHAIWE,                      :
                                    :
                        Defendants. :
                                    :
- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

          JARED EANNUCCI, being duly sworn, deposes and says
that he is a Task Force Officer with the United States
Attorney's Office for the Southern District of New York and an
Officer with U.S. Customs and Border Protection, and charges as
follows:

                            COUNT ONE
                (Conspiracy to Commit Bank Fraud)
                    (Business Email Compromise)

          1.    From at least in or about March 2019 up to and
including at least in or about May 2019, in the Southern
District of New York and elsewhere, JACOB SAGIAO, MARYLYNN
PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE
OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR

                                1

AHAIWE, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344.

2.   It was a part and an object of the conspiracy that JACOB SAGIAO, MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR AHAIWE, the defendants, and others known and unknown, willfully and knowingly, would and did execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

COUNT TWO
(Conspiracy to Commit Money Laundering)
(Business Email Compromise)

3.   From at least in or about March 2019 up to and including at least in or about May 2019, in the Southern District of New York and elsewhere, JACOB SAGIAO, MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR AHAIWE, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

4.   It was a part and an object of the conspiracy that JACOB SAGIAO, MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR AHAIWE, the defendants, and others known and unknown, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, wire fraud schemes involving business email compromises, knowing that the transactions were designed in whole and in part to conceal or

disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

### COUNT THREE
(Aggravated Identity Theft)

5.   From at least in or about February 2019 up to and including at least in or about May 2019, in the Southern District of New York and elsewhere, VICTOR AHAIWE, the defendant, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, AHAIWE controlled and transacted in a bank account of another person, who was deceased, including by using a debit card for that bank account, while holding himself out to be that other person, during and in relation to the bank fraud conspiracy alleged in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

### COUNT FOUR
(Wire Fraud)
(Romance Fraud)

6.   From at least in or about June 2019 up to and including the present, in the Southern District of New York and elsewhere, BRITT JACKSON, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, JACKSON participated in and received proceeds from an online romance fraud, in which the victim was induced to send money to JACKSON based on false representations, and, in furtherance of such scheme, JACKSON caused an interstate wire to be sent from

3

Pennsylvania to Georgia, which wire was processed through a bank located in New York, New York.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FIVE
(Wire Fraud)
(Fiji Fraud)

7.    From at least in or about October 2018 up to and including at least in or about October 2018, in the Southern District of New York and elsewhere, NDUKWE ANYAOGU, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, ANYAOGU participated in and received the proceeds from an email compromise scheme in which a law firm in Fiji was induced to send money to ANYAOGU based on false representations, and, in furtherance of such scheme, ANYAOGU caused an international wire to be sent from Fiji to Georgia, which wire was processed through a correspondent bank located in New York, New York.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

8.    I am a Task Force Officer with the United States Attorney's Office for the Southern District of New York and an Officer with U.S. Customs and Border Protection.  I have been personally involved in the investigation of this matter.  This affidavit is based upon my investigation, my conversations with law enforcement agents and others, and my examination of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4

Overview

9.    From at least in or about March 2019 up to and
including at least in or about May 2019, JACOB SAGIAO, MARYLYNN
PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE
OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR
AHAIWE, the defendants, received, transferred, and sent the
proceeds of two business email compromise schemes (the "BEC
Schemes"), described further below, in which the victims (the
"Victims") were induced to send approximately $4.5 million to
bank accounts controlled by SAGIAO and OBIKA.   In order to
launder the proceeds of the BEC Schemes, the defendants created
bank accounts that listed "d/b/a" names that closely resembled
the names of real companies, so that transfers of proceeds
between and among those bank accounts would appear to be
transactions between real companies.

         a.    In the first BEC Scheme ("BEC-1"), a
technology company ("Victim-1") was induced to send
approximately $4 million to a bank account, which listed, as a
"d/b/a" of the accountholder, the name of an actual business
counterparty of Victim-1 ("Counterparty-1"), but which was
actually controlled by SAGIAO.   After SAGIAO received the
proceeds of BEC-1, SAGIAO transferred those proceeds, either
directly or through intermediaries, to bank accounts controlled
by PENEUETA, JACKSON, FITTEN, and COTTRELL, each of which
listed, as a "d/b/a" of the accountholder, a name that closely
resembled the name of a real company that the accountholder was
not affiliated with.

         b.    In the second BEC Scheme ("BEC-2"), a health
services organization ("Victim-2") was induced to send
approximately $500,000 to a bank account, which listed, as a
"d/b/a" of the accountholder, a name that closely resembled the
name of a food company ("Counterparty-2"), but which was
actually controlled by OBIKA.   After OBIKA received the proceeds
of BEC-2, OBIKA transferred those proceeds, either directly or
through intermediaries, to bank accounts controlled by SAGIAO,
FITTEN, URO, ANYAOGU, and BASS, each of which listed, as a
"d/b/a" of the accountholder, a name that closely resembled the
name of a real company that the accountholder was not affiliated
with.   Proceeds of BEC-2 were also sent to AHAIWE, who deposited
the funds in a bank account in the name of a deceased person
(the "Decedent") that AHAIWE controlled.

         10.    From at least in or about June 2019 up to and
including the present, BRITT JACKSON, the defendant,

participated in and received proceeds from an online romance fraud scheme, in which a man residing in Pennsylvania ("Victim-3") was induced to send over $130,000 based on false representations (the "Romance Fraud").

11.   From at least in or about October 2018 up to and including at least in or about October 2018, NDUKWE ANYAOGU, the defendant, participated in and received approximately $380,000 in proceeds from an email compromise scheme involving a law firm in Fiji, which were intended for a woman residing in California ("Victim-4") (the "Fiji Fraud").

BEC-1

12.   Based on my review of reports prepared by other law enforcement officers, including documents referenced in those reports and documents provided to me by Victim-1,[1] I have learned, among other things, the following:

a.   Victim-1 is a Chinese technology company. Victim-1 regularly conducts business with Counterparty-1, which is a corporate affiliate of a major U.S. technology company.

b.   On or about March 27, 2019, an employee of Victim-1 ("Employee-1") received an email purporting to be from an employee in the procurement department of Victim-1's parent company ("Employee-2"). This email--which was sent from the same email address that Employee-2 had previously used to correspond with Employee-1 about business--falsely stated that the payee information for Counterparty-1 had changed and that the new bank account for Counterparty-1 was a certain bank account purportedly held at a bank in New York, New York ("Phony Counterparty-1 Account").[2]   In fact, Employee-2 did not send this email and was not aware of the email at the time it was sent.[3]

---

[1]   Certain documents I have reviewed in the course of this investigation were originally written in Chinese.  I have reviewed and relied upon English translations of those documents provided by Victim-1.

[2]   Based on my review of bank records, I have learned that, in reality, Phony Counterparty-1 Account is held at a bank in California.

[3]   Based on my training and experience, I believe that Employee-2's email account was hacked and that an attacker sent

c.   On or about April 1, 2019, Employee-2 sent an email to Employee-1 directing Employee-1 to make a payment of $4,088,412 to Counterparty-1 in connection with a business transaction.  This was a legitimate email from Employee-2.

d.   On or about April 2, 2019, Employee-1 wired $4,088,412 to Phony Counterparty-1 Account, in reliance on the March 27, 2019 email.

e.   On or about April 16, 2019, Counterparty-1 advised Victim-1 that Phony Counterparty-1 Account did not belong to Counterparty-1 or any of its corporate affiliates.

13.   Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, including bank surveillance and certain open source materials, I have learned, among other things, the following:

a.   Phony Counterparty-1 Account was opened in person by JACOB SAGIAO, the defendant, on or about March 19, 2019, and lists, as a "d/b/a" of SAGIAO (the accountholder), a name that closely resembles the name of Counterparty-1, although, as discussed above, Phony Counterparty-1 Account did not belong to Counterparty-1 or any of its corporate affiliates.

b.   On or about April 5, 2019, after receiving the $4,088,412 wire transfer from Victim-1, SAGIAO sent a wire transfer in the amount of $1,000,000 from Phony Counterparty-1 Account to a bank account held at a bank in the United Kingdom (the "U.K. Account").  This wire transfer was processed through a correspondent bank located in New York, New York.

c.   On or about April 5, 2019, SAGIAO withdrew cashier's checks in the amounts of $250,000 and $290,000 from Phony Counterparty-1 Account.  Bank surveillance shows that SAGIAO was the person who withdrew the cashier's checks.[4]

---

the March 27, 2019 email to Employee-1 purporting to be from Employee-2.

[4]   In the course of this investigation, I have obtained a photograph of SAGIAO from records maintained by the California Department of Motor Vehicles.   Based on comparison with this

d.   On or about April 8, 2019, the $250,000 cashier's check that SAGIAO withdrew from Phony Counterparty-1 Account was deposited into a certain bank account ("Bank Account-1"). Bank Account-1 was opened in person by BRITT JACKSON, the defendant, on or about October 23, 2018, and lists, as a "d/b/a" of JACKSON (the accountholder), a name that closely resembles the name of a real company ("Company-1"). The cashier's check deposited into Bank Account-1 was made payable to Company-1 and bank surveillance shows that JACKSON was the person who deposited the check.[5]

i.   Company-1 is a Canadian company in the business of manufacturing tractors. The transaction history in Bank Account-1 reflects no transactions that appear to relate to the legitimate business of Company-1. After Bank Account-1 was opened on or about October 23, 2018, no transactions occurred until the deposit of $250,000 on or about April 8, 2019.

ii.   JACKSON, who lives in Georgia, has no known connection to Company-1. The corporate address listed for Company-1 in account opening documents for Bank Account-1 is JACKSON's own personal address, as reflected on his driver's license. When JACKSON opened Bank Account-1, he described Company-1 as a sole proprietorship of which he was the owner, whereas the real Company-1 is a corporation.

iii.   On or about May 2, 2019, after the $250,000 cashier's check was deposited into Bank Account-1, JACKSON sent a wire, in the amount of $237,500, from Bank Account-1 to a bank account held at a bank in China.

e.   On or about April 8, 2019, the $290,000 cashier's check that SAGIAO withdrew from Phony Counterparty-1 Account was deposited into a certain bank account ("Bank Account-2"). Bank Account-2 was opened in person by MARYLYNN PENEUETA, the defendant, on or about March 15, 2019, and lists,

---

photograph, I believe that the person in the bank surveillance is SAGIAO.

[5]   In the course of this investigation, I have obtained a photograph of JACKSON from records maintained by the Georgia Department of Motor Vehicles. Based on comparison with this photograph, I believe that the person in the bank surveillance is JACKSON.

as a "d/b/a" of PENEUETA (the accountholder), a name that closely resembles the name of a real company ("Company-2"). The cashier's check deposited into Bank Account-2 was made payable to Company-2.

        i.     Based on public social media posts and open source information, I have learned that PENEUETA is the wife or romantic partner of SAGIAO and that they reside together.

        ii.     Company-2 is a New York company in the business of manufacturing concrete products. The transaction history in Bank Account-2 reflects no transactions that appear to relate to the legitimate business of Company-2.

        iii.     PENEUETA, who lives in California, has no known connection to Company-2. The corporate address listed for Company-2 in the account opening documents for Bank Account-2 is PENEUETA's own personal address, as reflected on her driver's license. When PENEUETA opened Bank Account-2, she described Company-2 as a sole proprietorship of which she was the owner, whereas the real Company-2 is a corporation.

        iv.     After the $290,000 cashier's check was deposited into Bank Account-2, on or about April 22, 2019, PENEUETA sent a wire, in the amount of $88,950, from Bank Account-2 to a bank account held at a bank in Canada. On or about April 23, 2019, PENEUETA sent another wire, in the amount of $88,950, from Bank Account-2 to a bank account held at a bank in China. Each of these wire transfers was processed through a correspondent bank located in New York, New York.

        f.     On or about April 22, 2019, after receiving the $290,000 cashier's check from SAGIAO, PENEUETA purchased the following five cashier's checks using funds from Bank Account-2:

        i.     A cashier's check in the amount of $16,000 ("PENEUETA Check-1");

        ii.     A cashier's check in the amount of $16,000 ("PENEUETA Check-2");

        iii.     A cashier's check in the amount of $15,615 ("PENEUETA Check-3");

        iv.     A cashier's check in the amount of $16,645 ("PENEUETA Check-4"); and

        v.    A cashier's check in the amount of $20,000 ("PENEUETA Check-5").

        g.    On or about April 23, 2019, PENEUETA Check-1 and PENEUETA Check-2, totaling $32,000, were deposited into a certain bank account ("Bank Account-3"). Bank Account-3 was opened in person by DONTAE COTTRELL, the defendant, on or about April 12, 2019, and lists, as a "d/b/a" of COTTRELL (the accountholder), a name that closely resembles the name of a real company ("Company-3"). Both PENEUETA Check-1 and PENEUETA Check-2 were made payable to Company-3. Account opening documents show that COTTRELL's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[6]

        i.    Company-3 is a major California company in the business of manufacturing power tools. The transaction history in Bank Account-3 reflects no transactions that appear to relate to the legitimate business of Company-3.

        ii.    COTTRELL, who lives in California, has no known connection to Company-3. The corporate address listed for Company-3 in the account opening documents for Bank Account-3 is COTTRELL's own personal address, as reflected on his driver's license. When COTTRELL opened Bank Account-3, he described Company-3 as a sole proprietorship of which he was the owner.

        iii.    Between in or about April 23, 2019 and April 26, 2019, COTTRELL made cash withdrawals in the total amount of $32,000 from Bank Account-3.

        h.    On or about April 26, 2019 and April 29, 2019, PENEUETA Check-3 and PENEUETA Check-4, respectively, totaling $32,260, were deposited into a certain bank account ("Bank Account-4"). Bank Account-4 was opened in person by JOSHUA FITTEN, the defendant, on or about March 21, 2019, and

---

[6]    Bank records for Bank Account-3 list the driver's license number that was provided to the bank at the time of account opening. In the course of this investigation, I have obtained a photograph of COTTRELL, maintained by the California Department of Motor Vehicles, linked to the same driver's license number. The photograph on the driver's license matches a photograph that COTTRELL submitted as part of a passport application in 2012.

lists, as a "d/b/a" of FITTEN (the accountholder), a name that closely resembles the name of a real company ("Company-4"). Both PENEUETA Check-3 and PENEUETA Check-4 were made payable to Company-4.  Account opening documents show that FITTEN's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[7]

      i.    Company-4 is a Taiwanese company in the business of manufacturing hand tools and industrial hardware. The transaction history in Bank Account-4 reflects no transactions that appear to relate to the legitimate business of Company-4.

      ii.    FITTEN, who lives in California, has no known connection to Company-4.  The corporate address listed for Company-4 in account opening documents for Bank Account-4 is FITTEN's own personal address, as reflected on his credit reports.  When FITTEN opened Bank Account-4, he described Company-4 as a sole proprietorship of which he was the owner, whereas the real Company-4 is a corporation.

      iii.    Between April 26, 2019 and April 30, 2019, FITTEN made cash withdrawals in the total amount of $32,800 from Bank Account-4.

      i.    On or about April 22, 2019, PENEUETA Check-5, in the amount of $20,000, was deposited into a certain bank account ("Bank Account-5").  Bank Account-5 was opened in person by JACOB SAGIAO, the defendant, on or about January 31, 2019, and lists, as a "d/b/a" of SAGIAO (the accountholder), a name that closely resembles the name of a real company ("Company-5"). PENEUETA Check-5 was made payable to Company-5.

---

[7]    Bank records for Bank Account-4 list the driver's license number that was provided to the bank at the time of account opening.  As described further below in paragraph 16(f), the same driver's license number was provided when FITTEN opened another account, Bank Account-8 (as defined below).  Bank records for Bank Account-8 include a photocopy of that driver's license, which includes a photograph of FITTEN.  Furthermore, FITTEN provided the same phone number for both Bank Account-4 and Bank Account-8.  Based on telephone subscriber records I have reviewed in the course of this investigation, the subscriber of that phone number is FITTEN.

        i.    Company-5 is a Serbian company in the military defense business.  The transaction history in Bank Account-5 reflects no transactions that appear to relate to the legitimate business of Company-5.

        ii.    SAGIAO, who lives in California, has no known connection to Company-5.  The corporate address listed for Company-5 in account opening documents for Bank Account-5 is SAGIAO's own personal address, as reflected on his driver's license.  When SAGIAO opened Bank Account-5, he described Company-5 as a sole proprietorship of which he was the owner, whereas the real Company-5 is a corporation.

        iii.    On or about May 1, 2019, SAGIAO made a cash withdrawal in the amount of $14,000 from Bank Account-5.

## BEC-2

14.  Based on my discussions with other law enforcement officers and my review of reports prepared by other law enforcement officers, I have learned, among other things, the following:

        a.    Victim-2 is a health services organization in Sint Maarten.

        b.    On or about March 4, 2019, Victim-2's finance department received an email from the email account of the Chief Financial Officer of Victim-2 (the "CFO") directing a $500,000 wire transfer to a certain bank account in Brooklyn, New York ("Phony Counterparty-2 Account") for the benefit of Counterparty-2, which is a real company.  In fact, the CFO did not send this email and was not aware of this email at the time it was sent.

        c.    On or about March 6, 2019, Victim-2's finance department wired $499,900 ($500,000 minus a $100 wire fee) to Phony Counterparty-2 Account, in reliance on the March 4, 2019 email.  This wire transfer was processed through a correspondent bank located in New York, New York.

        d.    On or about March 11, 2019, the CFO was alerted to the wire transfer and learned that his email account had been compromised.

15.  Based on my discussion with a representative of Counterpary-2, I have learned, among other things, that Phony

Counterparty-2 Account did not belong to Counterparty-2 or any of its corporate affiliates.

16.   Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, including bank surveillance and certain open source materials, I have learned, among other things, the following:

a.   Phony Counterparty-2 Account was opened in person by ARINZE OBIKA, the defendant, on or about November 16, 2018, and lists, as a "d/b/a" of OBIKA (the accountholder), a name that closely resembles the name of Counterparty-2, although, as discussed above, Phony Counterparty-2 Account did not belong to Counterparty-2 or any of its corporate affiliates. Account opening documents show that OBIKA's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[8]

b.   On or about March 8, 2019, after receiving the $499,900 wire transfer from Victim-2, OBIKA withdrew $485,974 from Phony Counterparty-2 Account and purchased the following five cashier's checks:

i.   A cashier's check in the amount of $50,988 ("OBIKA Check-1");

ii.   A cashier's check in the amount of $34,993 ("OBIKA Check-2");

iii.   A cashier's check in the amount of $34,993 ("OBIKA Check-3");

iv.   A cashier's check in the amount of $196,000 ("OBIKA Check-4"); and

v.   A cashier's check in the amount of $169,000 ("OBIKA Check-5").

c.   Between on or about March 8, 2019 and March 11, 2019, OBIKA made cash withdrawals in the total amount of $13,800 from Phony Counterparty-2 Account.

---

[8]   A photocopy of OBIKA's driver's license was maintained in the bank records for Phony Counterparty-2 Account.

   d. On or about March 8, 2019, OBIKA Check-1, in the amount of $50,988, was deposited into a certain bank account ("Bank Account-6"). Bank Account-6 was opened in person by DAVID URO, the defendant, on or about December 11, 2018, and lists, as a "d/b/a" of URO (the accountholder), a name that closely resembles the name of a real company ("Company-6"). OBIKA Check-1 was made payable to Company-6. Account opening documents show that URO's Nigerian passport and United States Permanent Resident card, both bearing his photograph, were provided to the bank at the time of account opening.[9]

   i. Company-6 is a British company in the commercial aerospace, defense, and security businesses. The transaction history in Bank Account-6 reflects no transactions that appear to relate to the legitimate business of Company-6.

   ii. URO, who lives in New York, has no known connection to Company-6. The corporate address listed for Company-6 in account opening documents for Bank Account-6 is URO's own personal address, as reflected on his driver's license. This same address was listed by ARINZE OBIKA, the defendant, as the address for the accountholder of Phony Counterparty-2 Account. When URO opened Bank Account-6, he described Company-6 as a sole proprietorship of which he was the owner, whereas the real Company-6 is a corporation.

   iii. Between in or about March 12, 2019 and March 13, 2019, URO made cash withdrawals in the total amount of $24,000 from Bank Account-8.

   e. On or about March 11, 2019, OBIKA Check-2, in the amount of $34,993, was deposited into a certain bank account ("Bank Account-7"). Bank Account-7 was opened in person by JACOB SAGIAO, the defendant, on or about February 28, 2019, and lists, as a "d/b/a" of SAGIAO (the accountholder), a name that closely resembles the name of a real company ("Company-7"). OBIKA Check-2 was made payable to Company-7. Account opening documents show that SAGIAO's driver's license, bearing his

---

[9] Photocopies of the Nigerian passport and Permanent Resident card were maintained in the bank records for Bank Account-6.

photograph, and his Social Security Card were provided to the bank at the time of account opening.[10]

      i.    Company-7 is a Dutch company that appears to be in the zoo logistics business. The transaction history in Bank Account-7 reflects no transactions that appear to relate to the legitimate business of Company-7.

      ii.    SAGIAO, who lives in California, has no known connection to Company-7. The corporate address listed for Company-7 in the account opening documents for Bank Account-7 is SAGIAO's own personal address, as reflected on his driver's license. When SAGIAO opened Bank Account-7, he described Company-7 as a sole proprietorship of which he was the owner, whereas the real Company-7 is a corporation.

      iii.    On or about March 12, 2019, SAGIAO made cash withdrawals in the total amount of $34,000 from Bank Account-7.

      f.    On or about March 11, 2019, OBIKA Check-3, in the amount of $34,993, was deposited into a certain bank account ("Bank Account-8"). Bank Account-8 was opened in person by JOSHUA FITTEN, the defendant, on or about January 9, 2019, and lists, as a "d/b/a" of FITTEN (the accountholder), a name that closely resembles the name of a real company ("Company-8"). OBIKA Check-3 was made payable to Company-8. Account opening documents show that FITTEN's driver's license, bearing his photograph, and his Social Security Card were provided to the bank at the time of account opening.[11]

      i.    According to records maintained by the British government, Company-8 is a British company that was dissolved in or about October 2016 and then re-formed in or about March 12, 2019. The transaction history in Bank Account-8 reflects no transactions that appear to relate to the legitimate business of Company-8.

---

[10]    Photocopies of SAGIAO's driver's license and Social Security Card were maintained in the bank records for Bank Account-7.

[11]    Photocopies of FITTEN's driver's license and Social Security Card were maintained in the bank records for Bank Account-8.

ii.    FITTEN, who lives in California, has no known connection to Company-8.  The corporate address listed for Company-8 in the account opening documents for Bank Account-8 is FITTEN's own personal address, as reflected on his credit reports.

iii.    On or about March 11, 2019, the same day that OBIKA Check-3, in the amount of $34,993, was deposited into Bank Account-8, FITTEN made a cash withdrawal in the amount of $34,400 from Bank Account-8.

g.    On or about March 11, 2019, OBIKA Check-4, in the amount of $196,000 was deposited into a certain bank account ("Bank Account-9").  Bank Account-9 was opened in person by NDUKWE ANYAOGU, the defendant, on or about December 27, 2019, and lists, as a "d/b/a" of ANYAOGU (the accountholder), the name of a shell company ("Company-9").  OBIKA Check-4 was made payable to Company-9.  Account opening documents show that ANYAOGU's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[12]

i.    Company-9 was organized by ANYAOGU as a Georgia LLC in or about August 22, 2018.  Based on my review of open source material and public databases, Company-9 conducts no real business.  The corporate address listed for Company-9 in account opening documents for Bank Account-9 for Company-9 is ANYAOGU's own personal address, as reflected on his driver's license.  The building at that address is a residential apartment building.

ii.    On or about March 20, 2019, ANYAOGU attempted to wire $191,500 from Bank Account-9 to the U.K. Account, which is the same account to which JACOB SAGIAO, the defendant, wired $1,000,000 of the proceeds of BEC-1, as described above in paragraph 13(b).  The requested wire transfer was declined by the bank where Bank Account-9 was held.  On or about March 21, 2019, ANYAOGU withdrew the balance of Bank Account-9, in the amount of $193,539.85, as a cashier's check made out to Company-9.

h.    On or about March 14, 2019, OBIKA Check-5, in the amount of $169,000, was deposited into a certain bank account ("Bank Account-10").  Bank Account-10 was opened in

---

[12]    A photocopy of ANYAOGU's driver's license was maintained in the bank records for Bank Account-9.

person by HERMAN BASS, the defendant, on or about March 14, 2019, and lists, as a "d/b/a" of BASS (the accountholder), a name that closely resembles the name of a real company ("Company-10").  OBIKA Check-5 was made payable to Company-10.

      i.    Company-10 is a California company in the business of valve engineering and manufacturing.  The transaction history in Bank Account-10 reflects no transactions that appear to relate to the legitimate business of Company-10.

      ii.    BASS, who lives in California, has no known connection to Company-10.  The corporate address for Company-10 listed in the account opening documents for Bank Account-10 is not the address listed on the real Company-10's website as Company-10's corporate address.  When BASS opened Bank Account-10, he described Company-10 as a sole proprietorship of which he was the owner.

      iii.    On or about March 23, 2019 and March 25, 2019, BASS wrote two personal checks from Bank Account-10 made payable to the Decedent, a person who, according to public records, died on or about January 3, 2019 (the "Decedent Checks").  Bank surveillance shows BASS accessing Bank Account-10 at a teller window on or about March 26, 2019.[13]

      i.    On or about March 25 and 26, 2019, the Decedent Checks, totaling $100,000, were deposited into a certain bank account in the name of the Decedent ("Bank Account-11").  On or about April 5, 2019, a check in the amount of $27,250 drawn on Bank Account-11 was deposited at another bank account in the name of the Decedent ("Bank Account-12").  For the following reasons, I believe that, at the time the $27,250 check was deposited, Bank Account-12 was under the control of VICTOR AHAIWE, the defendant:

      i.    AHAIWE also maintained an account in his own name (the "AHAIWE Account") at the same bank where Bank Account-12 is held.

---

[13]    In the course of this investigation, I have obtained a photograph of BASS from records maintained by the California Department of Motor Vehicles.  Based on comparison with this photograph, I believe that the person in the bank surveillance is BASS.

    ii. The address listed for the Decedent in Bank Account-12 is the same as the address listed for AHAIWE in the AHAIWE Account.  Based on my review of phone subscriber records, I have learned that the phone number listed for the Decedent on Bank Account-12 is subscribed to AHAIWE's home address.  Based on my review of email subscriber records, I have learned that the subscriber of the email account listed for the Decedent on Bank Account-12 is AHAIWE.

    iii. Bank surveillance shows that, on or about March 6, 2019, AHAIWE accessed Bank Account-12 from an ATM.[14]  Bank records show that AHAIWE used the debit card for Bank Account-12, in the name of the Decedent, in order to access the ATM.

Online Romance Fraud

  17. Based on my discussions with Victim-3 and documents provided to me by Victim-3, along with certain open source materials, I have learned, among other things, the following:

    a. Victim-3 resides in Pennsylvania.

    b. In or about June 2019, Victim-3 met an individual who identified himself as "Joseph Cordoba" on an online dating website.  After initially meeting on the website, Victim-3 and "Joseph Cordoba" continued their communications through email and by phone.

    c. In the course of communications with Victim-3, "Joseph Cordoba" stated, in sum and substance, that he owned an interior design business (the "Phony Design Business") in Connecticut.  Based on my review of open source and law enforcement databases, the Phony Design Business does not exist.

    d. In the course of email communications with Victim-3, "Joseph Cordoba" purported to live at an address in Connecticut.  Based on my review of open source material, that address does not exist.

---

[14] In the course of this investigation, I have obtained a photograph of AHAIWE from records maintained by the California Department of Motor Vehicles.  Based on comparison with this photograph, I believe that the person in the bank surveillance is AHAIWE.

e.   In or about July 2019, "Joseph Cordoba" called Victim-3 and stated, in sum and substance, that he needed to pay import taxes on furniture for the Phony Design Business to an importer (the "Phony Importer").   In reliance on this representation and subsequent phone and email communications with "Joseph Cordoba," on or about July 11, 2019, Victim-3 mailed a $10,000 check payable to the Phony Importer, addressed to BRITT JACKSON, the defendant.   "Joseph Cordoba" had previously described JACKSON as a representative of the Phony Importer.

f.   In or about July 2019, "Joseph Cordoba," in phone and email communications, told Victim-3, in sum and substance, that he needed money to pay for the shipping of furniture from the Phony Importer to the Phony Design Business. "Joseph Cordoba" agreed to treat as a loan any money that Victim-3 sent for this purpose, and "Joseph Cordoba" executed a promissory note.   In reliance on these representations, Victim-3 initiated the following wires:

i.   On or about July 16, 2019, Victim-3 wired $16,500 to JACKSON at a bank account in Georgia provided by "Joseph Cordoba" ("Bank Account-13").   This wire was processed through a bank located in New York, New York.

ii.   On or about July 24, 2019, Victim-3 wired an additional $30,000 to JACKSON at Bank Account-13.   This wire was processed through a bank located in New York, New York.

g.   In or about August 2019, "Joseph Cordoba," in phone and email communications, told Victim-3, in sum and substance, that he needed money to pay for fees related to the estate of the father of "Joseph Cordoba," which "Joseph Cordoba" claimed was worth millions of U.S. dollars.   "Joseph Cordoba" agreed to treat as a loan any money that Victim-3 sent for this purpose, and "Joseph Cordoba" executed a promissory note.   In reliance on these communications, on or about August 21, 2019, Victim-3 wired $80,000 to a bank account in Hong Kong, China.

h.   In or about the summer of 2019, "Joseph Cordoba" and Victim-3 made plans to meet for a date in Manhattan.   In anticipation of that meeting, Victim-3 made travel arrangements, including a hotel reservation.   Shortly before the planned meeting, "Joseph Cordoba" cancelled.   Victim-3 has never seen "Joseph Cordoba" in person.

   i. "Joseph Cordoba" has not repaid any of the promissory notes that he executed in order to induce Victim-3 to send money.

   j. "Joseph Cordoba" continues to communicate with Victim-3 through the present.

  18. Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, including bank surveillance, I have learned, among other things, the following:

   a. Bank Account-13 was opened in person in or about November 19, 2018 by BRITT JACKSON, the defendant.

   b. On or about July 16, 2019, the same day that Victim-3 wired $16,500 to Bank Account-13, JACKSON withdrew cash from Bank Account-13 at an ATM.  Bank surveillance shows that JACKSON was the person who accessed the ATM.[15]

   c. On or about July 18, 2019, JACKSON withdrew $17,200 from Bank Account-13 in the form of a cashier's check. Bank surveillance shows that JACKSON withdrew the funds at a teller window.

   d. On or about July 26, 2019--shortly after receiving the $30,000 wire from Victim-3 on or about July 24, 2019--JACKSON wired $23,965 to a bank account held at a bank in Canada, which is the same bank account that, on or about April 22, 2019, received a $88,950 wire from MARYLYNN PENEUETA, the defendant, in connection with BEC-1, as described above in paragraph 13(e)(iv).

<u>Fiji Fraud</u>

  19. Based on my discussions with other law enforcement officers and my review of reports prepared by other law enforcement officers, I have learned, among other things, the following:

---

[15] In the course of this investigation, I have obtained a photograph of JACKSON from records maintained by the Georgia Department of Motor Vehicles.  Based on comparison with this photograph, I believe that the person in the bank surveillance is JACKSON.

a.   In or about 2018, Victim-4, a woman who resides in California, was the intended beneficiary of certain proceeds from the sale of land in Fiji (the "Estate Proceeds"). A law firm in Fiji ("the Fiji Firm") was responsible for sending the Estate Proceeds--which were in the total approximate amount of $380,000--to Victim-4.

b.   On or about October 2, 2018, the Fiji Firm received an email purportedly sent by Victim-4's daughter (who had authority to handle Victim-4's affairs with the Fiji Firm), directing the Fiji Firm to send the Estate Proceeds to a certain bank account in Georgia ("Bank Account-14").  In fact, the email was sent by a third-party, and Bank Account-14 did not belong to Victim-4.  The October 2, 2018 email listed, as the address for the accountholder of Bank Account-14, the home address of NDUKWE ANYAOGU, the defendant.

c.   One or about October 4, 2018 and October 9, 2019, the Fiji Firm sent the Estate Proceeds, by two wire transfers, each in the approximate amount of $194,000, to Bank Account-14.

20.   Based on bank records and other documents and evidence that I have reviewed in the course of this investigation, I have learned, among other things, the following:

a.   The two wire transfers from the Fiji Firm to Bank Account-14 were processed through a correspondent bank located in New York, New York.

b.   Bank Account-14 was opened in person by NDUKWE ANYAOGU, the defendant, on or about October 1, 2018, and lists, as a "d/b/a" of ANYAOGU (the accountholder), the name of Victim-4.  The phone number and email address listed on Bank Account-14 are ANYAOGU's phone number and email address. Account opening documents show that ANYAOGU's driver's license, bearing his photograph, was provided to the bank at the time of account opening.[16]

---

[16]   Bank records for Bank Account-14 list the driver's license number that was provided to the bank at the time of account opening.  As described above at paragraph 16(g), the same driver's license number was provided when ANYAOGU opened another account, Bank Account-9.  Bank records for Bank Account-9

c.   After Bank Account-14 received the two wires intended for Victim-4 from the Fiji Firm, ANYAOGU withdrew cashier's checks and initiated international wire transfers from Bank Account-14.   For example:

i.   On or about October 5, 2018, ANYAOGU withdrew $40,000 from Bank Account-14 in the form of a cashier's check payable to another person.   Also on or about October 5, 2018, ANYAOGU wired $97,000 from Bank Account-14 to a bank account held at a bank in Turkey.   This wire was processed through a correspondent bank in New York, New York.

ii.   On or about October 12, 2018, ANYAOGU withdrew funds from Bank Account-14 to fund a $50,000 cashier's check to another entity controlled by ANYAOGU and a $40,000 cashier's check to another person.   Also on October 12, 2018, ANYAOGU sent two international wires, in the amounts of $194,000 and $10,000 from Bank Account-14 to bank accounts held at banks outside of the United States.   Each of these international wires was processed through a correspondent bank located in New York, New York.

21.   Based on my review of bank records and publicly available documents, I have learned that each of the banks where Phony Counterparty-1 Account, Phony Counterparty-2 Account, Bank Account-1, Bank Account-2, Bank Account-3, Bank Account-4, Bank Account-5, Bank Account-6, Bank Account-7, Bank Account-8, Bank Account-9, Bank Account-10, Bank Account-11, Bank Account-12, Bank Account-13, Bank Account-14, and the AHAIWE Account were opened is insured by the Federal Deposit Insurance Corporation.

22.   Based on my training and experience, individuals who engage in criminal activity--including wire fraud schemes like BEC-1, BEC-2, the Romance Fraud, and the Fiji Fraud--often take steps to conceal the source of proceeds of that criminal activity, that is, to launder the proceeds.   The methods used to launder such criminal proceeds can include, as relevant here, creating new bank accounts in the names of entities and transferring money between those accounts as cash or as cashier's checks.   In cases where the underlying criminal activity occurred outside the United States but the proceeds are

---

include a photocopy of that driver's license, which contains a photograph of ANYAOGU.

sent to the United States to be laundered, the proceeds are frequently sent back overseas after they have been laundered.

      WHEREFORE, I respectfully request that warrants be issued for the arrests of JACOB SAGIAO, MARYLYNN PENEUETA, BRITT JACKSON, JOSHUA FITTEN, DONTAE COTTRELL, ARINZE OBIKA, NDUKWE ANYAOGU, HERMAN BASS, DAVID URO, and VICTOR AHAIWE, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

JARED EANNUCCI
Task Force Officer
United States Attorney's Office for the
Southern District of New York

Sworn to before me this
11 day of February, 2020

THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

23